IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MARY JONES and JOSEPH ALFORD, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CASE NO. 1:06-CV-585-WHA |
| ) | |
| THOMAS FLATHMANN, ) | |
| ) | |
| Defendant. ) | |

## AFFIDAVIT OF THOMAS FLATHMANN

STATE OF ALABAMA,

HOUSTON COUNTY.

Before me, the undersigned authority for administering oaths, personally appeared **Thomas Flathmann** who was a deputy sheriff and investigator with the Houston County Sheriff's Office, Houston County, Alabama, who being by me first duly sworn, deposes and says as follows:

I am Thomas Flathmann and I was a deputy sheriff and investigator with the Houston County Sheriff's Office and was on duty as a deputy sheriff at all times material to the claims made by the plaintiffs in this case. My principal duties involved performing the law enforcement duties of a deputy sheriff in the State of Alabama. I have personal knowledge of the facts and information contained herein. Except as otherwise indicated herein directly or clearly by the context thereof, I have personal knowledge of the information contained herein.

EXHIBIT A

On January 18, 2006, I received information from a reliable confidential informant that within the previous twenty-four hours that the confidential informant ("CI") was with another person who purchased cocaine at 481 Harvey Hicks Road, Pansey, Alabama, from a black male that the CI referred to as "Josh." The CI witnessed the drug sale transaction take place at 481 Harvey Hicks Road, Pansey, Alabama. The CI also informed me that there were several vicious dogs chained in and around several junk cars and around the storage building in the back yard area of the house. The CI thought that the cocaine may be concealed in the junk cars near the storage building in the back yard. The CI also told me that she believed the black male called Josh drove a white Cadillac automobile.

In addition to the information provided to me by the CI, the residence located at 481 Harvey Hicks Road was known by me to be a location where known drug activity had been reported. For example, on July 22, 2005, based on information provided by a confidential informant, deputies from the Houston County Sheriff's office executed a search warrant at 481 Harvey Hicks Road. At the time of the July 22, 2005 search, the house was searched as well as the yard area around the house. It was reported that, during that search, a white pill bottle with a white substance was found that when tested was found to be cocaine. It was also reported that the second item found on July 22, 2005, consisted of three plastic bags of marijuana that were located in one of the bedrooms of the plaintiffs' house. Reportedly, the next item recovered consisted of two plastic bags of marijuana found under the kitchen table in the plaintiffs' house. In the yard outside the house inside one of the vehicles, a Tupperware jar with five plastic bags of marijuana was found along with a set of scales and two firearms. Two individuals present in the house at the time were arrested for Possession of Marijuana First and unlawful possession of a controlled substance.

Another example of information related to the residence located at 481 Harvey Hicks Road being known to be a location where drug activity had been reported involved the execution of a search warrant on August 5, 2005. Again information was provided to a Houston County Deputy Sheriff that narcotics related activity had been observed at 481 Harvey Hicks Road, Pansey, Alabama that resulted in the issuance and execution of a search warrant at the residence. According to the report, during that search, numerous methadone pills (a controlled substance) were found in a small plastic bag. No prescription for methadone was produced. Reportedly one of the individuals in the house was arrested for possession of controlled substance at that time.

Based on the information provided by the CI, on January 18, 2005, Circuit Judge Larry K. Anderson issued an other search warrant for the search of the premises of 481 Harvey Hicks Road. At approximately 9:50 p.m., the search warrant was executed. When we arrived at the scene, a white Cadillac was one of the vehicles parked by the house. Outside the side door of the house, we knocked and yelled through the door "sheriff's department – search warrant." After waiting a few seconds, the outer storm door was opened and a metal door ram was used to gain entry through the locked door. Some deputies had side arms drawn and held at the ready at the time of the entry and some had tazers drawn and held at the ready. I had my tazer drawn and at the ready at the time of the entry into the house. Entry was made though the side door of the residence and contact was made with a male and female in the back bedroom. The male subject had a handgun in his hand at the time contact was made and had to be told several times to drop the firearm before he complied. The male was later determined to be Joseph Alford. The female was later determined to be Mary Jones.

At the time of the entry in to the house, I along with all of the other deputies wore "raid vests," with the word "SHERIFF" in bold letters that were three to five inches in height on the back of the vest and on the front of vest, also in bold letters one to two inches in height. In addition we all had our deputy sheriff badges hung around our necks clearly visible outside the front of the "raid vests." In addition, as we entered and secured the house, we all were yelling over and over "sheriff's department – search warrant" to identify ourselves and our purpose for being there to any occupants of the house. It is my recollection that most, if not all of the deputies involved in the execution of the search warrant were wearing baseball caps of one type or another. No officer had their face covered or wore a hood of any kind.

At the time of entry and while securing the premises tazers and side arms were at the ready should the use of force prove necessary; however, no firearms were discharged, no tazers were discharged and there were no physical struggles with the plaintiffs during the execution of the search warrant. I, personally, never pointed my tazer or side arm at either Ms. Jones or Mr. Alford.

After Mr. Alford put down his gun, both Mr. Alford and Ms. Jones put their hands up. Neither Mr. Alford nor Ms. Jones asked what the search was about. Instead, Ms. Jones started yelling and cussing at us. What I can remember her yelling over and over and over was "I gots me a good suit you cracker ass mother f - - -ers," "I'm gonna gits my money, you cracker ass mother f - - - ers," "stop the flashlights and use the lights, you stupid cracker ass mother f - - - ers," and "I gonna sue you cracker ass mother f - - - ers." The bedroom where the plaintiffs were found had piles and piles of clothes and other stuff all over the floors before we began our search of the house – the house was a piled up mess before the search began. Ms. Jones was repeatedly instructed to come out of the bedroom and instead of complying, she continued to rant, rave and cuss at us. She was

allowed to pretty much yell herself out and finally she was talked out of the bedroom. Neither Ms. Jones nor Mr. Alford were handcuffed at any time during the execution of the search warrant. Neither Ms. Jones nor Mr. Alford were forcibly removed from the bedroom. They were instructed to remain in the kitchen while the rest of the house was searched and they did so even though Ms. Jones continued to rant, rave and cuss at us. I never touched Ms. Jones or Mr. Alford. Once in the kitchen, I gave Mr. Alford a copy of the search warrant that was being executed.

While the house was being searched and Ms. Jones and Mr. Alford were seated in the kitchen under the supervision of a deputy, Ms. Jones began to say that she was having chest pains and was short of breath. To my knowledge, the only time Ms. Jones was touched by a deputy sheriff was when she started saying that she was having chest pains and appeared to be fainting or falling. Other deputies supported her and her husband eventually helped her to lay down on the floor of the kitchen. At that point, a deputy called the rescue squad to attend to her. Members of the rescue squad arrived shortly thereafter, took her vitals and worked with Ms. Jones for some time. Ultimately Ms. Jones refused further medical treatment and transport by the rescue squad even after she was informed of the risks of doing so.

As a result of the search of the premises, a burnt hand rolled marijuana cigarette, one Sunkist soda can fashioned into a smoking device with burnt cocaine residue on it and one Coke soda can fashioned into a smoking device with burnt cocaine on it were found in the storage building in the backyard of the house. This evidence was collected and sent to the Alabama Department of Forensic Sciences for testing and the test results confirmed the cigarette was marijuana and the residue on the soda cans was cocaine.

During the search and in order to assist us, Mr. Alford provided us with keys to the only two motor vehicles that were in reasonably good shape and appeared to be drive-able. There were no keys made available for the junk cars and none were needed except for a trunk that had to be forced open. The junk cars were such that weeds were growing in and among the cars and the junk cars appeared not to have been operated or moved for a long time. There were several junk cars (6-10 of them) in the back yard and around the storage building. Several fighting type and apparently vicious dogs were found to be in and around the junk cars and storage building in the back yard. When found the dogs were tied such that the chain or rope of each dog did not overlap, but all of the area in and around the storage building and junk cars was accessible to at least one of the dogs.

Our search of the premises was completed for some time before we could actually leave the premises. We could not leave the premises until after the rescue squad personnel were ready to leave. While we were waiting for the rescue personnel to leave, two black males and one female arrived at the scene and started yelling at us. They were informed that we had a search warrant for the residence. Even after being informed of the search warrant the two males continued yelling at us in a rage. They were disorderly and kept yelling at us to get off their mother's property. The two males were advised to calm down or they would have to be taken into custody and they responded by yelling repeatedly that they were not afraid to go to jail. The situation was tense and could easily have escalated; however, one of the deputies knew the two males and was able to calm the situation sufficient such that the use of physical force was not necessary. After the rescue squad personnel cleared the scene, all investigators including myself left the scene.

Although Ms. Jones was a very large obese woman, neither I nor any other deputies to my knowing ever referred to her as "fat" or used the "N" word, cussed at her or in any way threaten to shoot her if she did not "shut up"

      THOMAS FLATHMANN

STATE OF ALABAMA,

HOUSTON COUNTY.

Before me, the undersigned authority, personally appeared **Thomas Flathmann**, who being sworn by me according to law, deposes and states that the matters and things alleged in the above Affidavit are true and correct to the best of his information, knowledge and belief.

Sworn to and subscribed before me on this the 21st day of December, 2007.

      NOTARY PUBLIC
      My Commission Expires: 12-9-2008